Nichols v. Moody.

---

## NICHOLS *vs.* MOODY.

A public agent, acting in the line of his duty, is not personally liable upon contracts made by him on behalf of the government; unless it appears that the credit was given to, or the labor performed for, the agent himself, and on his agreement and promise to pay; or the fact of his being a public agent was unknown, and not disclosed at the time of making the contract.

A distinction exists between public agents and those of a private character, in respect to their personal liability.

Ordinarily, an agent contracting in behalf of the government, or of the public, is not personally bound by such contract, because it is not to be presumed, either that a public agent intends to bind himself personally, or that a party contracting with him in his public character means to rely upon his individual responsibility.

A collector of the customs of the United States government is not, in the absence of an express promise to pay, liable for the wages of a person employed by him as night watch and oarsman.

The doctrine of *respondeat superior* applies to such a case.

THIS action was commenced before a justice of the peace of St. Lawrence county. It was for work and labor, and a separate count in the complaint averred that the defendant, in the month of April, 1854, hired and employed the plaintiff

to work for him, at the price or sum of $30 per month, and that the plaintiff worked for the defendant, under the said agreement, from the 15th of August, 1854, to the 1st of January, 1855. The defendant denied the allegations of the complaint. On the trial the plaintiff proved by *R. M. Barns*, that the defendant was collector of customs for the district of Oswegatchie, and entered upon the duties of his office on the 21st day of August, 1854. The witness testified, "The plaintiff was around the office. He commenced stopping there from about the time the defendant took the office. The defendant told me to go to a certain place, the plaintiff to another place, Lascelles to another, and Low to another. We were sent to watch what was coming over. I heard the defendant say, two or three times, that he had sent the plaintiff out to watch. I saw the plaintiff get the oars, and he and the defendant went off in a boat together. It was about 8 or 9 o'clock in the evening. I heard the defendant say that he had the plaintiff with him, such a night, and that he thought the plaintiff considerable of a coward." On being cross-examined, the witness further testified that the plaintiff informed him that he was there as a *secret informer*. The informer is entitled to one quarter of the seizures made. *Smith Low*, another witness for the plaintiff, testified that he was watchman of the revenue in the custom house at Ogdensburgh; that he had been out with the plaintiff four or five times; twice they were gone from 9 P. M. till 2 or 3 in the morning. The plaintiff acted as night watch and oarsman, during the months of August and September; had known of the plaintiff being out other times, when he was not with him, but could not say how often. The witness further testified that any one has the right to inform, and is entitled to one quarter of the seizure, if one is made. He had heard the defendant say to the plaintiff, "Well, Nichols, do you intend to get a quarter to-night?" *C. W. Lascelles* also testified for the plaintiff, that he knew that the plaintiff had been out watching several times, since the defendant had been in the custom house. He was up and down the St. Lawrence river, at different points, with the witness, by direction of the defendant. The witness

Nichols *v.* Moody.

went with the plaintiff, the last time he recollects of, first to the rail road depot, at the suggestion of the plaintiff. On being asked what, in his opinion, the services of the plaintiff were worth per month, the question was objected to by the defendant's counsel as immaterial. The court received the evidence, and the witness answered that he could form no opinion of what the plaintiff's services were worth, for he did not know how much he was out. It was worth, the times he was out with the witness, 6 or 8 shillings per night. He knew that the plaintiff was about the office from the time the defendant came in, in August, until after election the same year. R. M. Barns, on being recalled, further testified that he had been in the office every day but two, since the defendant had held the office of collector. The plaintiff came into the office almost every evening during the time, until almost election time, in November, 1854. He would come in and sit down, and sometimes in the daytime. There was no particular duty in the office that he could do. He had met the plaintiff several times, when he had been out, and "talked things over with him." He had heard the defendant ask him, on some occasions, where he was, and what he had been doing the night before. Heard both the plaintiff and the defendant say that the defendant had paid the plaintiff five dollars, but neither said what it was for. The government pays $20 per month for services of night watch and oarsmen. A witness on the part of the defendant testified that the plaintiff went over the bridge with him, one night, and told him to go around and look in that way, unless he had the power to seize a thing when he saw it.

The testimony being closed, the defendant's counsel moved for a nonsuit, on the ground that if any services were proved by the plaintiff they were performed for the government, and that the defendant was not individually liable therefor. The court denied the motion, and the jury rendered a verdict in favor of the plaintiff for $51.25 damages, for which, with costs, the justice rendered judgment, being their verdict upon the calculation that the plaintiff had proved, to their satisfaction, seventy-five nights' services, at six shillings per night, and de-

ducting the sum of five dollars paid by the defendant. The county court of St. Lawrence county affirmed the judgment, and the defendant appealed to the supreme court.

*Brown & Spencer*, for the plaintiff.

*Morris & Nary*, for the defendant.

*By the Court*, C. L. ALLEN, P. J. The plaintiff failed entirely in establishing, by proof, the special count in his complaint. If he had made out such a contract as in that count alleged, he would probably have been entitled to recover. It has undoubtedly been established, by a great number of cases, that a person acting as a public agent may contract with an individual in such a manner as to make himself personally liable; but the facts and circumstances must, in such cases, show the contract to be very special, and that the party gave the credit to, or performed the labor for, the individual alone, and on his promise and agreement to pay; or the fact of his being a public agent must be unknown, and must not be disclosed at the time of making the contract. The great inquiry in such cases is, to whom was the credit intended to be given. (*Dunlap's Paley on Agency*, 376, 7, *and notes*. 1 *Term R.* 180. 2 *Kent's Com.* 632. 3 *Dallas*, 384. 12 *John.* 385, 444. 15 *id.* 1. 19 *id.* 63. 7 *Cowen*, 451. 8 *id.* 191.) And even an express promise to pay is not always the criterion. But much depends upon the question whether the agent intended to make himself personally liable. (*Walker* v. *Swartwout*, 12 *John.* 444. 2 *Wend.* 375.) A very different rule prevails in regard to public agents from that which is applicable to those of a private character. Ordinarily, an agent contracting in behalf of the government or of the public, is not personally bound by such a contract, although he might be, perhaps, if it were an agency of a private character. The reason of the distinction, say the elementary writers, and the adjudged cases, is, "that it is not to be presumed, either that the public agent intends to bind himself personally, in acting as a functionary of the gov-

ernment, or that the party dealing with him in his public character, means to rely upon his individual responsibility. On the contrary, the natural presumption, in such cases, is that the contract was made upon the credit and responsibility of the government itself, as possessing an entire ability to fulfill all its just contracts, far beyond that of any private man, and that it is ready to fulfill them, not only with good faith, but with punctilious promptitude and in a spirit of liberal courtesy." (*Story on Agency,* ch. 11, § 302, *and cases cited in notes. Dunlap's Paley on Agency,* 376, 377, *and notes.*)

This has been the doctrine from the leading case of *Macbeath* v. *Haldiman,* (1 *T. R.* 172, 181,) followed as late as the case of *Girley* v. *Lord Palmerston,* (3 *Brod. & Bing.* 275,) in England, through a great variety of adjudications in our own country. (*See Hodgson* v. *Dexter,* 1 *Cranch,* 345 ; 1 *Mass. Rep.* 208 ; 9 *id.* 490 ; 6 *id.* 253 ; 3 *Dallas,* 384.) The cases of *Macbeath* v. *Haldiman,* and *Hodgson* v. *Dexter,* were recognized and followed by the supreme court of this state, in *Walker* v. *Swartwout,* (12 *John.* 444, 448,) virtually overruling the case of *Sheffield* v. *Watson,* (3 *Caines,* 69,) which has been pronounced more than once, "*an extraordinary decision.*" In the case just cited as overruling it, the defendant was quarter master general of the United States army, which arrived at French Mills, Franklin county, about the 20th November, 1813. He directed certain boatmen who were with the army (and the plaintiff among the rest) to go to work for the use of the army, and promised that they should each be allowed for their services $2 per day. The plaintiff worked, accordingly, about six weeks, when he applied to the defendant, who was about to leave French Mills, for a certificate as evidence of the contract, and of the time he had worked, and the defendant replied, "*my word is sufficient,*" and told the plaintiff to go to work, and he would pay him, when his work was done. The plaintiff continued to work under this assurance, for several weeks afterwards, when he was discharged without pay. He brought his action against the defendant, and a verdict was rendered in his favor, subject to the opinion of the supreme court. Thompson, Ch. J.,

was of opinion that he was entitled to recover, upon the express promise. But the rest of the court thought otherwise; and Spencer, J., in delivering the opinion of the court, remarks that "whether the court, in *Sheffield* v. *Watson*, made a correct application of the principles recognized and established in the cases of *Macbeath* v. *Haldiman* and *Hodgson* v. *Dexter*, to the facts before them, might admit of some doubt, but the court certainly did not intend to overrule them." After commenting upon the opinion of Judge Livingston, in the case of *Sheffield* v. *Watson*, and observing that the court were not to be considered as committed, by the peculiar phraseology or illustrations of the judge who gave the opinion, Justice Spencer proceeds to remark: "It has been argued in this case, that the defendant promised to pay the plaintiff for it, when his work was done. The same argument was urged in *Hodgson* v. *Dexter*, and the fact in that case was, that Mr. Dexter covenanted, under seal, to keep the premises in good repair, &c. But the court holding it to be a contract entirely on behalf of government, considered the obligation to be on the government only, and not a personal undertaking. The facts in this case (he adds) show very clearly that it never was in the contemplation of either party, originally, until some time after the labor was done, that the defendant should be personally responsible." And again he remarks: "I entirely agree with Ch. J. Marshall, that to hold a public agent, acting in the line of his duty, liable for contracts made on account of government, would be productive of the most injurious consequences to the public as well as individuals, and no prudent man would consent to become a public agent, if he should be made personally responsible on the public account. This is not the case of an isolated boatman. The same principles which will render the defendant liable in this case will, for aught I perceive, make him liable to all the boatmen descending the St. Lawrence with the army, for it seems he set them all at work, at $2 per day, and hence the greater improbability that he meant to subject himself."

I have quoted thus largely from this opinion, because it is

Nichols v. Moody.

peculiarly applicable, in many of its facts and circumstances, to the case we are now considering, and is a much stronger one, in many of its bearings, in favor of a recovery, than the present. In that case there was an express promise to pay; in this there is no such promise.

The same principle was again sanctioned in *Rathbon* v. *Budlong*, (15 *John.* 1,) and in *Bronson* v. *Woolsey*, (17 *id.* 46.) In the latter case the defendant, a captain in the United States navy, employed the plaintiff, with his vessel, to transport ordnance and stores on Lake Ontario, and finally caused it to be sunk in the lake near Oswego. It was decided that he was acting on behalf of the government, and could not be held personally responsible. So in the case of *Olney* v. *Wickes*, (18 *John.* 122,) the court said that "where a public agent acts ostensibly in the line of his official duty, his contracts are public and not personal." See also 1 *Cowen*, 513 ; *Fox* v. *Drake*, (8 *id.* 191 ;) *Belknap* v. *Reinhart*, (2 *Wend.* 375,) in which a promise was made by the defendant to pay a certain reward for apprehending a deserter. See also *Osborne* v. *Kerr*, (12 *Wend.* 179,) which was an action against a canal superintendent, and where the court placed their decision upon the ground that the case did not show that the defendant intended to bind himself personally. Also *Chitty on Con. 8th Am. ed.* 251, 2 ; *Story on Agency*, 388, § 302, &c.; *Dunlap's Paley*, 376 *to* 379, *and notes.*

Now what are the facts, in this case, upon which the defendant relies, to distinguish it from those above cited. As already remarked, no express promise was proved, nor is any pretended. The plaintiff relies upon the implied undertaking on the part of the defendant, to hold himself individually responsible. The only evidence is, that the plaintiff being "about" the custom house after the defendant was appointed collector, acted voluntarily as a night watch and oarsman, or as a secret informer. He was directed by the defendant, in a few instances, to repair to particular points on the river, and he was found to be at the office almost every evening. In a word, he acted much as others did, about the office, who were in the same business; the de-

fendant asking him, on some occasions, if he "*intended to get his quarter*" that night. The question is, did the defendant intend to make himself personally liable to the plaintiff, for his services, and did the plaintiff so contract, or intend to contract? There is no evidence from which such an intent may be inferred. This is not, as was remarked in *Walker* v. *Swartwout*, the case of an isolated boatman. Every boatman and night watch engaged in the business could probably make as much proof against the defendant as did the plaintiff in this action, and would be as much entitled to recover. No one can for a moment suppose or believe that the defendant ever intended to make himself personally responsible to all these men. The plaintiff well knew that the defendant was collector, and that the services he was performing were for the benefit of the government, and that the defendant was acting in the line of his duty as collector, in obtaining such services, and that the government paid $20 per month for services such as those rendered by him. It was his duty, if employed at the office, to present his account, duly verified according to the regulations of the department. (*Gordon's Dig. U. S. Laws, p.* 95, § 395.) The last report of the secretary of the treasury shows that the sum of $240 was appropriated for the services of night watch and oarsmen at the port of Oswegatchie, for the year 1855. The collector has the right, and it is his duty, if necessary, to employ such persons, who must be sworn in, and the collector is not personally responsible for their services, any more than for those of any other officer under him. His directions to the plaintiff to go to particular places to watch, probably arose out of his power to employ on behalf of the government, and they raise no presumption that he intended to make himself personally responsible. The plaintiff did not himself pretend so, until after his discharge. At all events, it is to my mind very clear that he did not bestow his labor upon the credit of the defendant as an individual. It is more than probable that he was acting, as he told the witness Barns, as "*a secret informer*," and that his remaining about the office was to obtain one quarter of the seizures that might be made, on his information,

If he acted in that capacity there was no privity of contract between him and the defendant, from which an implied promise could be raised. The defendant did not need such service, and if it was performed, it was for the plaintiff's own benefit. (*Gordon's Dig.* 951, § 3286.) But upon the other view, no implied promise can be raised against the agent; and no express promise was proved. The doctrine of *respondeat superior* applies, and the justice should have nonsuited the plaintiff. It is said the verdict was not supported by the evidence, as to the amount. This is probably correct, but as it was entirely against law and evidence, it cannot be sustained for any amount, and the judgment rendered upon it, and that of affirmance by the county court, must be reversed, with costs.

[Saratoga General Term, July 8, 1856. *C. L. Allen, Paige, James* and *Rosekrans,* Justices.]